FILED

2007 Dec-04  PM 01:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **LORETTA HINES-SMITH** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| **v.** | ) | **2:06-1241-JHH** |
| | ) | |
| **ADT SECURITY SERVICES, INC.** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

## MEMORANDUM OF DECISION

The court has before it the July 30, 2007 motion (doc. # 26) of defendant ADT Security Services, Inc. for summary judgment.  Pursuant to the court's August 7, 2007 and August 22, 2007 orders, the motion was deemed submitted, without oral argument, on September 11, 2007.

### I. Procedural History

Plaintiff Loretta Hines-Smith commenced this action on June 23, 2006 by filing a complaint in this court alleging employment discrimination on the basis of gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e

et seq., and on the basis of race in violation of Title VII and 42 U.S.C. § 1981.[1]
More specifically, plaintiff contends that defendant unlawfully terminated her
employment and discriminated against her during her employment in pay, job
assignments, sales leads, sales charge backs, and promotion.  (Compl. ¶¶ 8-12.)
Defendant's motion for summary judgment asserts that plaintiff's claims fail as a
matter of law.

Both parties have filed briefs and submitted evidence in support of their
respective positions.  Defendant submitted evidence[2] (docs. # 27-31) in support of
its own motion for summary judgment on July 30, 2007, and a brief (doc. # 32) in
support of summary judgment on August 6, 2007.  On September 4, 2007, plaintiff
filed a brief and evidence[3] (doc. # 35) in opposition to defendant's motion for
summary judgment.  On September 11, 2007, defendant filed a brief (doc. # 36) in
reply to plaintiff's opposition.

---

[1] Originally, Katrina Smalls-Neal was a co-plaintiff to this complaint.  By order dated
May 21, 2007, the claims of Smalls-Neal were severed from the claims of Hines-Smith.  (See
doc. #19.)

[2] The defendant submitted the following evidence: deposition of Loretta Hines-Smith and
exhibits; deposition of Audrey Courseault and exhibits; deposition of Kathryn Howard and
exhibits; deposition of William Conner and exhibits; deposition of Chris Byrley and exhibits;
deposition of James Robertson; deposition of Kathryn Howard and exhibits; declaration of Laney
Davis and exhibits.

[3] The plaintiff submitted the following evidence: 8/4/2006 interoffice memorandum from
William Conner to Chris Byrley.

2

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. See id. at 323. Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. See id. at 324.

The substantive law will identify which facts are material and which are irrelevant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable

3

jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

If the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted.  See id. at 249.

The method used by the party moving for summary judgment to discharge

its initial burden depends on whether that party bears the burden of proof on the

issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four

Parcels of Real Prop., 941 F.2d 1428 (11th Cir. 1991) (en banc)).  If the moving

party bears the burden of proof at trial, then it can only meet its initial burden on

summary judgment by coming forward with positive evidence demonstrating the

absence of a genuine issue of material fact; i.e. facts that would entitle it to a

directed verdict if not controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once

the moving party makes such a showing, the burden shifts to the non-moving party

to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy

its initial burden on summary judgment in either of two ways.  First, the moving

party may produce affirmative evidence negating a material fact, thus

demonstrating that the non-moving party will be unable to prove its case at trial.

Once the moving party satisfies its burden using this method, the non-moving

party must respond with positive evidence sufficient to resist a motion for directed

4

verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[4]

Loretta Hines-Smith, an African-American, began her employment with ADT on August 21, 2004 as a sales representative in the residential resale department of ADT's Pelham, Alabama office. (Howard Dep. at 30, 33; Ex. 1 to Howard Dep.) Kathryn Howard, the resale manager and Hines-Smith's supervisor during her employment with ADT, hired Hines-Smith because of her solid reputation in the industry. (Howard. Dep. at 20, 29.) Bill Conner was the sales and installation manager for the Pelham office and was the person in charge of the branch. (Id. at 22; Courseault Dep. at 23.)

### A. Hines-Smith's Duties

Hines-Smith was responsible for selling security systems and monitoring to homeowners who resided in homes where a former owner had contracted with ADT. (Howard Dep. at 61-62.) Most of these homes had installed control panels, keypads, and door contacts, so potential new customers did not have to pay installation charges. (Conner Dep. at 21.) However, the activation of the previously-installed equipment sometimes required the installation of additional equipment or updating of existing equipment. (Id. at 17; Howard Decl. ¶ 3.) )

---

[4] If the facts are in dispute, they are stated in a manner most favorable to the non-movant. See Fitzpatrick, 2 F.3d at 1115.

Hines-Smith was paid by commission for selling monitoring services and home security equipment.  (Conner Dep. at 17.)  She was a "commission-only" resale representative, and her pay was based solely on the number of contracts booked during the previous week, even if the job had not been installed. (Hines-Smith Dep. at 26.)  If the job did not get installed, which could happen for a number of reasons, see infra, the resale representative who sold the contract and was advanced their commission when the job was booked, would be "charged back" for the compensation that was previously paid.[5]  (Conner Dep. at 35.)  A "charge back" would also occur if the customer cancelled the sale or if the contract was administratively discontinued for non-payment.  (Howard Dep. at 41-42.)

In practice, Hines-Smith's day-to-day responsibilities were simple. Hines-Smith would arrange a meeting at the potential customer's home, verify that an installed system existed and determine if there were any additional equipment needed.  (Id. at 20-21; Howard Decl. ¶ 5.)  She would then obtain a signed service contract and schedule a date and time for an installer to come to the home and activate the system.  (Id.)  After booking the sale, Hines-Smith would submit the

---

[5] Howard, Hines-Smith's supervisor, was also paid on a commission only basis, and her compensation depended on the number of contracts sold by the resale representatives.  (Howard Dep. at 160-67.)  If a resale representative did not get paid, for any reason, Howard did not get paid.  (Howard Decl. ¶¶ 21, 25.)

signed contract to ADT, which would confirm that there was a viable system at the address that needed to be activated for monitoring and, if necessary, detailing what installation was required.  (Conner Dep. at 23.)  The contract, or "job,", was then forwarded to the installation coordinator so that an installer could be assigned to return to the customer's home and finish the job based on the terms of the signed contract.  (Id. at 30-31; Howard Decl. ¶ 5.)

Several circumstances could prevent an installer from being able to complete the installation.  For instance, if a customer was not home for the scheduled appointment, or if the equipment was broken or missing, the installation could not be completed.  (Conner Dep. at 20, 29-30; Byrley Dep. 31-33.)  If problems prevented an installation,[6] the installer would record the problems and return the paperwork to the installation coordinator, who would, in turn, report the problems to the sales team to resolve and reschedule.  (Conner Dep. at 30-32; Howard Dep. at 195-96.)  Notification of non-installed jobs occurred on a daily basis.  (Conner Dep. at 31.)

After repeated complaints from installers regarding jobs that were not completed because of mistakes made by resale representatives and the growing

---

[6] Like resale representatives, installers were paid on a commission basis and did not receive payment for jobs that did not get not installed.  (Conner Dep. at 20.)

backlog of unscheduled jobs, Conner implemented new guidelines to address the installation problems.  (Conner Dep. at 18-19; Ex. 2 to Conner Dep.)  Under these new guidelines, implemented in November 2004, after a job failed to completely install, the resale representative had three days to reschedule the job.  (Conner Dep. at 33; Ex. 2 to Conner Dep.)  If installation was not completed after two appointments, the job was automatically cancelled.  (Ex. 2 to Conner Dep.)

### B.  *Hines-Smith's Problems with Installations*

Hines-Smith's sales records show that she was successful at securing sales, but that she had a high percentage of her sales cancelled, resulting in "charge backs," because of installation problems.  (Conner Dep. at 28-29; Byrely Dep. at 70-71; Howard Dep. at 88-89.)   ADT maintains that these issues were because of installation problems discovered by the installer at the home and not reported by Hines-Smith (like the need for additional equipment), or failure of the customer to appear at the appointment time.  (Id.)  Hines-Smith testified, however, that it was her belief that Chris Bryley, the installation manager, was intentionally cancelling her jobs.  (Hines-Smith Dep. at 36, 40-41, 218-19.)

Hines-Smith testified regarding her "theory" for why so many of her jobs

were being cancelled.[7]   She believed that after she booked a job, Howard would approach Bryley and tell him to cancel the sale.  (Hines-Smith Dep. at 36, 40-41, 124, 218-19.)  Hines-Smith testified that she believed that Bryley would then instruct the installers assigned to her jobs to cancel them.[8]  (Id. at 36, 40-41, 218-19.)  Hines-Smith admitted that she was speculating about this testimony, that it was just her theory, and that she had no evidence to support it.  (Id. at 36-37.)  Bryely denied that Howard ever told him to cancel one of Hines-Smith's installations.  (Bryley Dep. at 55.)

On December 30, 2004, Howard received a notice from the installation coordinator of all of the pending jobs[9] that were scheduled for cancellation.  (Ex. 15 to Howard Dep. at 92.)  Of those cancelled jobs, approximately one-third of them were sales made by Hines-Smith, with no other sales representative having as many cancellations.  (Id.)  In response to the high number of cancelled jobs by

---

[7] Although Hines-Smith estimated that eighty to ninety percent of her jobs were cancelled, (Hines-Smith Dep. at 209-10), ADT records show that, approximately thirty-seven percent of her jobs were cancelled.  (Ex. 3 to Howard Dep.)

[8] Jamie Robertson testified that Bryely routinely cancelled installations so that his ratio of sales to installation would allow Bryley to receive bonuses.  (Robertson Dep. at 55-56.)  There is no evidence in the record that Bryley singled out Hines-Smith in these alleged routine cancellations, although Hines-Smith testified that it routinely happened to her.  (Hines-Smith Dep. at 209.)

[9] The list covered sales made by all representatives and not merely the resale department. (Howard Dep. at 176-77.)

10

her team, Howard issued a memo on December 31, 2004 notifying the sales

representatives that signed contracts would have to come to her for customer

verification before the contract would be booked for installation.  (Ex. 14 to

Howard Dep.)

In early January, Howard also gave Hines-Smith a Performance

Improvement Plan (PIP) regarding the high number of cancelled sales.  (Hines-

Smith Dep. at 96-97; Ex. 4 to Hines-Smith Dep.)  According to ADT, a PIP is

form[10] used as a type of discipline and is considered a written warning.[11]

(Courseault Dep. at 149-50.)   Hines-Smith was instructed that she needed to

ensure that her customers understood the terms of the contract, were aware of

when the technician would visit their home for the installation, and were aware of

what work the installation technician would perform.  (Ex. 4 to Hines-Smith Dep.)

A few days after receiving the PIP, however, on January 11, 2005, Hines-

Smith received another discipline regarding an installation problem.  (Ex. 2 to

Hines-Smith Dep.)  A customer contacted Howard after an installer attempted to

---

[10] ADT uses several different forms which are all considered "written warnings."  (See Coursealut Dep. at 149-52.)  Coursealult testified that there is no real difference between the forms, other than their layout and titles.  The main difference is between the ages of the forms.  (Id.)

[11] Hines-Smith, however, testified that a Performance Improvement Plan was something that everyone received as "a formality that they do to say what you're going to do for the next term to get your sales up."  (Hines-Smith Dep. at 95.)

go to the customer's home for an installation.  (Id.)  The customer reported that she was unaware that she was scheduled for an installation; instead, the customer had asked Hines-Smith to wait to schedule the installation until after the customer called Hines-Smith with her payment information for an upgrade to her alarm system.  (Id.)  In addition, the customer reported that Hines-Smith had represented to the customer that her alarm system would work "as is," even though the system had missing devices.  (Id.)

Hines-Smith also testified about two cancellations, in particular, that she believed were discriminatory.  The first involved a customer who requested a security system that would keep her son from sneaking out of the house.  (Hines-Smith Dep. at 33-35.)  The customer called and cancelled after the installer told the customer that the system would not detect her son if he removed the alarm contacts, which could be easily accomplished.  (Id.)  Although Hines-Smith admitted that the installer's statement to the customer was technically correct, she felt that the information should not have been provided to the customer.  (Id. at 36-37.)

The other event involved a sale where, after Hines-Smith completed the sale, Howard sent another resale representative, Luther Collier, a white male, to the customer's home to write the contract.  (Hines-Smith Dep. at 20, 31-32.)

12

Howard explained that the reason she sent Collier to the customer's house was because Hines-Smith informed Howard that she could not see the customer because of a funeral for a family member.  (Howard Decl. ¶ 33.)  Howard left a message for Hines-Smith regarding the reassignment of the customer to Collier, but Hines-Smith did not receive the message and went to the customer's house for the appointment.  (Id.)  When Hines-Smith complained to Howard about the incident, Howard told Hines-Smith that Hines-Smith would receive the next lead that came into the office, to make up for the lost sale.  (Id. at ¶ 34.)

## C.  Racial Slur by Chris Bryely

Chris Bryley was the installation manager for residential sales at the time Hines-Smith worked for ADT.  (Hines-Smith Dep. at 41.)  Jamie Robertson, a sales representative in the Pelham office, testified that he heard Bryley refer to Hines-Smith as a "gorilla-faced monkey" after looking at one of Hines-Smith's contracts that needed to be installed.[12]  (Robertson Dep. at 59, 64.)  It is unclear when this comment was made, other than at some point while Hines-Smith was employed at ADT.  (Id. at 65.)  Robertson told Hines-Smith about the comment.  (Id. at 125.)  Hines-Smith recalls Robertson telling her that Bryley said she was a

---

[12] Robertson testified that he heard Bryley use racial slurs on many occasions.  (Robertson Dep. at 68, 70, 118-19.)

13

"black gorilla." (Hines-Smith Dep. at 125.) Hines-Smith did not report this comment to anyone at ADT. (Id. at 126.) Robertson also testified that Bryley referred to Hines-Smith as "stupid" on more than one occasion. (Robertson Dep. at 135, 138.) There is no evidence as to when this comment was made or whether Robertson told Hines-Smith about the comment.

### D.  Hines-Smith's Termination

On August 16, 2005, Hines-Smith began short-term disability leave due to surgery on her foot.  (Hines-Smith Dep. at 92; Ex. 7 to Courseault Dep.) Her leave was scheduled to terminate on August 30, 2005, but after multiple extensions her leave was extended through October 21, 2005.  (Ex. 7 to Courseault Dep.)

While on leave, Howard received a call from a customer who was upset about an incident with Hines-Smith.  (Ex. 3 to Hines-Smith Dep; Howard Dep. at 209-11.)  According to Hines-Smith, the customer originally signed a contract with Hines-Smith's daughter, who was also a resale representative for ADT, but cancelled the contract after meeting with another resale representative, Jamie Robertson, who allegedly quoted the customer a better rate.  (Hines-Smith Dep. at 74-77, 121.)  After Hines-Smith learned that the customer cancelled the contract, Hines-Smith called the customer, and asked the customer "what happened" and

14

what her daughter "d[id] wrong." (Id. at 75, 78-81, 120-21.)  Hines-Smith also

called Robertson and confronted him for "unethically" taking her daughter's sale.[13]

(Id. at 77; Robertson Dep. at 24.)

After speaking with Hines-Smith, the customer called Howard to complain

about the incident. (Howard Dep. at 201.)  The customer told Howard that Hines-

Smith called her and informed the customer that her daughter was trying to put

herself through college, that she had driven all the way to her house and would not

be reimbursed for gas, and that she needed the money from the customer's

contract. (Id. at 201-11.)  The customer was upset that Hines-Smith called her,

and told Howard that Hines-Smith was rude to her. (Id. at 211-12.)  Although

Hines-Smith was still on leave, Howard decided to issue a written disciplinary

warning to Hines-Smith about the incident. (Id. at 215, 217; Ex. 19 to Howard

Dep.)  Hines-Smith was unaware of the disciplinary warning regarding the

incident until her termination meeting. (Hines-Smith Dep. at 101.)

On October 6, 2005, Laney Davis, the HR coordinator in the Pelham office,

received an e-mail from the Human Resources Service Center[14] stating that Hines-

_____

[13] Apparently, when Robertson realized that Hines-Smith's daughter was involved in the
earlier contract, he decided to let her handle it. (Howard Dep. at 211.)  The customer, however,
cancelled the contract and contracted with another alarm company. (Id.)

[14] All leave requests and other issues regarding leave are administered from the ADT
Human Resources Center in Jacksonville, Florida. (Courseault Dep. at 51.)

Smith needed a light duty assignment when she returned to work. (Davis Decl. ¶ 8.) Because Hines-Smith's foot injury would not allow her to perform her outside duties, her doctor indicated that she needed a sedentary position for two weeks. (Courseault Dep. at 54-55.) Audrey Courseault, the regional HR manager, arranged for a full-time sedentary administrative position in the Pelham office to keep her foot stationary. (Id. at 54-55, 188, 191.)

Hines-Smith returned to work on Monday, October 24, 2005, in a light duty administrative position. (Ex. 9 to Courseault Dep.) While in the administrative position, Hines-Smith was paid by the hour, instead of on commission, and was required to be in the office between 7:30 and 8:00 a.m. and work until 4:40 or 5:00 p.m. (Courseault Dep. at 90-91, 107, 191-92; Davis Decl. ¶ 9.) On her first day back to work, Hines-Smith reported to work at 8:00 a.m., as instructed. (Hines-Smith Dep. at 58, 61, 62.) In addition, in direct conflict with the information the Pelham office had regarding her work status, Hines-Smith gave ADT a full work release, with no restrictions, from her physician.[15]  (Ex. 9 to Courseault Dep.)

Because of issues relating to child care, Hines-Smith informed Courseault that she could not be at work at 8:00 a.m. while she was on temporary, light duty.

_____

[15] Courseault attempted to contact the HR Service Center to inquire about the conflict in the full work release and the request for light duty assignment, but could not reach anyone in the office because of a hurricane. (Courseault Dep. at 92-93.)

(Hines-Smith Dep. at 61-62.)  Instead, she stated that she could be to work by 9:00 a.m.  (Id.)  Hines-Smith also expressed frustration with a strict start time, noting that sales representatives did not have to come to work at a specific time.  (Id. at 58-60.)

In an effort to accommodate Hines-Smith, Courseault and Davis agreed to allow Hines-Smith to work part-time, from 9:00 a.m. to 1:00 p.m., while on light duty.  (Id. at 192-93; Davis Decl. ¶ 10.)  It was also agreed that she would not work on Tuesday.[16]  (Courseault Dep. at 70-71.)  There is a dispute as to whether this arrangement was for the first week only, or for the entire duration of her light duty assignment.  ADT maintains that it was for the first week only, while Hines-Smith testified that she was told by both Courseault and Conner that she did not have to be at work until 9:00 a.m.  (Id.; Hines-Smith Dep. at 113, 246.)   The Leave of Absence Form, returning Hines-Smith to part-time paid status, indicates 4 hours to be paid per day (9-1) and that she would work "M, W, Th, & F."  (Ex. 7 to Courseault Dep.)  The effective date is October 21, 2005, with no notation as to when this status would end.  (Id.)

On Monday, October 31, 2005, Hines-Smith reported to work "around 9

---

[16] Apparently, Hines-Smith had a conflict with working on Tuesdays. (Courseault Dep. at 70-71.)

o'clock." (Hines-Smith Dep. at 58.)  Because ADT believed that she was an hour

late, and because she had been late the previous week,[17] the decision was made to

terminate Hines-Smith.  (Hines-Smith Dep. at 58; Conner Dep. at 120-21;

Courseault Dep. at 96.)  Hines-Smith was called into a meeting with Conner and

Courseault, where she was presented with copies of her previous disciplines.[18]

(Hines-Smith Dep. at 93-94; Conner Dep. at 94-95; Courseault Dep. at 111-12.)

Conner informed Hines-Smith that she was terminated for failure to follow the

attendance policy.  (Conner Dep. at 77-79; Hines-Smith Dep. at 57-58.)

## IV. Applicable Substantive Law

Title VII makes it illegal for employers "to discharge any individual, or

otherwise to discriminate against any individual with respect to . . . compensation,

terms, conditions, or privileges of employment, because" of that individual's race

---

[17] The evidence shows that Hines-Smith reported to work at 8:00 a.m. on Monday, October 24, 2005; as scheduled, she did not work on Tuesday, October 25, 2005.  On Wednesday, October26, 2005, she worked from 9:00 - 1:00, but on Thursday, October 27, 2005, Hines-Smith arrived late, at 9:15 a.m., and left early, at 12:30 p.m.  (Ex. 17 to Howard Dep; David Decl. ¶¶ 15, 18.)  Hines-Smith testified that she had permission to leave early on Thursday.  Then on Friday, October 28, 2005, Hines-Smith arrived late at 9:30 a.m., requested her check, and left at 9:45 a.m. due to a family emergency.  (Ex. 17 to Howard Dep.; Davis Decl. ¶ 20.)

[18] There is some confusion surrounding the dates of her previous disciplines.  For purposes of summary judgment, however, it is enough to note that Hines-Smith acknowledges each discipline and the facts surrounding each one.  The court does find  that the final discipline, surrounding the incident with the customer and Hines-Smith's daughter, was never given to Hines-Smith until the termination meeting.  (Hines-Smith Dep. at 101.)  Additionally, none of the earlier disciplines had anything to do with Hines-Smith's attendance.

18

or sex, among other protected traits.  42 U.S.C. § 2000e-2(a)(1).  Section 1981

gives "all persons within the jurisdiction of the United States . . . the same right to

make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. §

1981(a)-(c).  When a litigant asserts claims under both Title VII and Section 1981,

the statutes "have the same requirements of proof and use the same analytical

framework."  Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir.

1998).

The analysis of the plaintiff's claims will be determined not only by the

nature of the allegations but also by the quality of the evidence offered in support

of those claims.  See id. ("[t]he analytical framework and burden of production

var[y] depending on the method of proof chosen").  In general, a plaintiff may

attempt to establish a claim of illegal employment discrimination through the use

of direct evidence, circumstantial (indirect) evidence, or statistics.  See id.; see

also Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999).  A plaintiff's

ability to proceed through the use of circumstantial evidence of discrimination is

necessarily important because direct proof of discrimination is uncommon.  See

Combs v. Plantation Patterns, 106 F.3d 1519, 1537 (11th Cir. 1997); Grigsby v.

Reynolds Metals Co., 821 F.2d 590, 595 (11th Cir. 1987).

Direct evidence is "[s]uch evidence [which], if believed, proves the

19

existence of a fact in issue without inference or presumption." Burns v. Gadsden State Cmty. College, 908 F.2d 1512 (11th Cir. 1990).  Cf. Wright v. Southland Corp., 187 F.3d 1287, 1293-94 (11th Cir. 1999) (per Tjoflat, J.) (defining direct evidence as "evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic" and finding the outcomes reflected in prior case law consistent with that definition); see also Bass v. Board of County Comm'rs, Orange County, Florida, 242 F.3d 996, 1010 (11th Cir. 2001) (discussing meaning of "direct evidence" in the context of a Title VII race discrimination claim; "direct evidence" refers to a type of evidence which, if true, would require no inferential leap in order for a court to find discrimination.").  "Direct evidence is composed of only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor." Rojas v. Florida, 285 F.3d 1339, 1342, n.2 (11th Cir. 2001)(quoting Schoenfeld, 168 F. 3d at 1266) (citations and quotations omitted).  However, direct evidence does not include "stray remarks in the workplace" or "statements by nondecisionmakers" or "statements by decisionmakers unrelated to the decisional process itself." Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (O'Connor, J., concurring) (1989); see also EEOC v. Alton Packaging Corp., 901 F.2d 920, 924 (11th Cir. 1990).

Here, plaintiff has presented only circumstantial evidence of racial discrimination.[19] "In evaluating [discrimination] claims supported by circumstantial evidence, [the courts of this circuit] use the now-familiar framework established by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and Texas Department of Cmty. Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)." Combs, 106 F.3d at 1527.  Under the McDonnell Douglas and Burdine framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally.  See id. at 1527-28.  The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed; rather they are flexible and depend to a large degree upon the facts of the particular situation.  See, e.g., Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1185 (11th Cir. 1984); Lincoln v. Bd. of Regents of Univ. Sys., 697 F.2d 928, 937 (11th Cir. 1983).  In general, a

---

[19]  The statements allegedly made by Chris Byrley, referring to Hines-Smith as "gorilla-face" or "black gorilla" do not constitute direct evidence of discrimination.  Rather, they are examples of "stray remarks," unconnected with the decision making process, which do not rise to the level of direct evidence.  See Price Waterhouse, 490 U.S. at  277 (O'Connor, J., concurring) (1989);  Alton Packaging Corp., 901 F.2d at 924.  The court also notes that, although Hines-Smith stated that she "brings direct evidence of racial animus directed toward her by [Chris Bryley] whose actions had a direct bearing on her employment status, if not her termination," (Pl. Opp. Br. at 18), Hines-Smith makes no argument regarding her claim of direct evidence, other than this lone statement.

21

plaintiff establishes a prima facie case of disparate treatment employment discrimination by showing that he or she was a qualified member of a protected class and was subjected to an adverse employment action but that otherwise similarly situated employees outside the plaintiff's class were treated dissimilarly.[20]  See McDonnell Douglas, 411 U.S. at 802 (hiring); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (discipline); see also Nix, 738 F.2d at 1185 (discipline); Pittman v. Hattiesburg Mun. Separate Sch. Dist., 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).

Once the plaintiff has shown a prima facie case and, thereby, has raised the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.[21]  See Rojas, 285 F.3d at 1342; Combs, 106 F.3d at 1528.  The employer "need not persuade the court that it was actually motivated by the proffered reasons."  Burdine, 450 U.S. at 254-55; see Chapman, 229 F.3d at 1024.  If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination

---

[20] See also McDonnell Douglas, 411 U.S. at 802 n.13 ("The facts necessary will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not applicable in every respect in different factual situations.").

[21] See Chapman, 229 F.3d at 1032 (A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which the employer based its subjective opinion.).

falls and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.[22]  Where the defendant articulates multiple, reasonable, legitimate and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons.  See Chapman, 229 F.3d at 1024-25.

Where plaintiff seeks to prove pretext by showing she was more qualified than the person given the job or promotion, she must show that the disparities between the successful applicant's and her own qualifications were "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff."  Cooper v. S. Co., 390 F.3d 695, 732 (11th Cir. 2004), cert. denied 126 S. Ct. 478 (2005) (citation omitted); see also Brooks v. County Comm'n of Jefferson County, Ala., 466 F.3d 1160, 1163 (11th Cir. 2006); Ash v. Tyson Food, Inc., 126 S. Ct. 1195, 1197 (2005) (approving of language in Cooper).  Although the prima facie case is irrelevant once the employer has offered a legitimate reason for its actions, the evidence of pretext may include the same evidence offered to establish the prima

---

[22] If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.  Simply quarreling with that reason is not sufficient.  Chapman, 229 F.3d at 1030.

facie case.  See Combs, 106 F.3d at 1528.

Despite this shifting of the burden of production between the plaintiff and the defendant under the McDonnell Douglas and Burdine framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Burdine, 450 U.S. at 253.  Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may prevail on an employment discrimination claim and may also defeat a summary judgement either by proving that intentional discrimination did indeed motivate the defendant or by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147-48 (2000) (pointing out that the production of the necessary sufficient evidence by plaintiff will not always prevent the employer from prevailing on a Rule 50 motion and suggesting that the strength of plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other properly considered evidence that supports the employer's case are among other factors to take into account in evaluating a Rule 50

24

motion);[23] St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993); Abel v. Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000); Alexander v. Fulton County, 207 F.3d 1303, 1336 (11th Cir. 2000); Combs, 106 F.3d at 1529-38 (interpreting Hicks and the post-Hicks case law); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 920-21 (11th Cir. 1993).

## V.  Discussion

In her complaint, Hines-Smith alleges that ADT discriminated against her because of her gender and race "in pay, job assignments, sales assignments, sales leads, charge backs," and promotions.  (Compl. §§ 10, 12.)  She also alleges that she was illegally terminated because of her gender and race.  (Compl. ¶ 11.) Defendant's motion for summary judgment asserts that plaintiff's claims fail as a matter of law.

Before discussing the merits of the allegations contained in Hines-Smith's complaint, the court first concludes that Hines-Smith has abandoned most of the claims in her complaint.  She specifically abandons in her brief in opposition to summary judgment her "issues she had regarding . . . [sales] leads and incidents of losing sales."  (Pl. Opp. Br. at 12 n.3).  Additionally, she implicitly abandons her

---

[23] The court in Chapman modified the statement in Combs contrary to this holding in Reeves after noting that the standard for granting summary judgment mirrors the standard for judgment as a matter of law.  See Chapman, 229 F.3d at 1025, n.11.

claims relating to pay, job assignments, charge backs and promotion by failing to make any argument to the court regarding this alleged discrimination.  See Sepulveda v. U.S. Atty. Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) ("When a [party] fails to offer argument on an issue, that issue is abandoned.") (citations omitted).

Finally, it is clear from Hines-Smith's brief, that she also abandons her claim of gender discrimination.  Although she states in her opposition brief that she brings of claim of gender discrimination under Title VII (see Pl. Opp. Br. at 16), the argument made to the court addresses only her claim of race discrimination.  She does make two passing references to the fact that males were not terminated for violations of comparable seriousness (id. at 20), but these two small statements are not the equivalent of argument.   Besides the statement of her claim and the two passing references to gender, no where in Hines-Smith's brief does she discuss gender discrimination.  She does not state any facts relating to such a claim or make any meaningful argument in support of it.  Instead, her brief focuses almost exclusively on the alleged racism of ADT's former installation manager, which, she contends, led to her termination.  As such, the court deems her claims of gender discrimination under Title VII abandoned.  See Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (stating that

26

passing references to issues are insufficient to raise a claim for appeal, and such issues are deemed abandoned)).   Summary judgment is due to be granted as to all of the claims abandoned by plaintiff.

One claim remains in this action: discrimination on the basis of race in her termination in violation of Title VII and Section 1981.  As stated above, plaintiff presents a case of circumstantial evidence of race discrimination; she has not presented any direct evidence of discrimination in her termination.  The court now turns its attention to this remaining claim.

Hines-Smith may establish a prima facie case of discrimination in her termination through circumstantial evidence by proving that (1) she belongs to a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees outside her classification more favorably; and (4) she was qualified to do the job.  Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004); see also Holifield, 115 F.3d at 1562 (citing McDonnell Douglas, 411 U.S. at 802; Coutu v. Martin County Bd. of County Comm'rs, 47 F.3d 1068, 1073 (11th Cir. 1995); Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1060 (11th Cir. 1994)).  The plaintiff and the employee she identifies as a comparator must be similarly situated "in all relevant respects." Holified, 115 F.3d at 1562.  The comparator must be nearly identical to the

plaintiff to prevent courts from second-guessing a reasonable decision by the employer.  See Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1259 (11th Cir. 2001).

It is undisputed that Hines-Smith is a member of a protected class, that she suffered an adverse employment action, and that she was qualified for her job. ADT argues that Hines-Smith failed to establish a prima facie case because she failed to identify any employee not in her protected class who was similarly situated and treated more favorably than she was treated.  The court agrees with ADT.  Hines-Smith completely fails to identify a suitable comparator.  In fact, she fails to identify any comparator.  Her comparisons to the attendance requirement of resale representatives is inapposite as she was admittedly working in an hourly position at the time of her termination, and it is undisputed that administrative positions required set hours.  Hines-Smith did not identify any person, working in an hourly position, who was not disciplined for failure to come to work on time.[24]

Instead, Hines-Smith argues she can establish a prima facie case without reference to comparators by demonstrating that she did not actually commit the

---

[24] Hines-Smith's comparison to Chris Byrley, who was demoted for favoritism in installation assignments, being unaproachable and abrasive, and for derogatory racial slurs, (see Ex. A to Pl. Opp. Br.) is misplaced.  The court is at a loss to see how Bryley, in any way, amounts to a similarly situated comparator, as that term is used in the Eleventh Circuit.  See Holified, 115 F.3d at 1562.

infractions made the basis of her discipline and resulting termination.  (Pl. Opp.

Br. at 18-20, 26-27.)  In making this argument, Hines-Smith relies on Jones v.

Gerwens, 874 F.2d 1534 (11th Cir. 1989).  Jones reads in pertinent part as follows:

> Accordingly, we hold that, in cases involving alleged racial bias in the application of discipline for violation of work rules, the plaintiff, in addition to being a member of a protected class, must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct.

Id. at 1540 (emphasis added).   The Eleventh Circuit has analyzed this language to

mean that the emphasized phrase following the final comma applies to both

subsections (a) and (b).  Jones v. Bessemer Carraway Medical Center, 137 F.3d

1306, 1311 n.6 (11th Cir.), superseded in unrelated part, 151 F.3d 1321 (11th Cir.

1998).  Thus, "under the Jones formulation, no plaintiff can make out a prima facie

case by showing merely that she belongs to a protected class and that she did not

violate her employer's work rule," as argued by Hines-Smith.  Id.  "The plaintiff

must also point to someone similarly situated (but outside the protected class) who

disputed a violation of the rule and who was, in fact, treated better."  Id.   As

discussed above, Hines-Smith completely failed in this regard.

     Hines-Smith's failure to identify a comparator does not end the analysis of

her termination claim, however.  See Wilson, 376 F.3d at 1092.  "If a plaintiff fails

to show the existence of a similarly situated employee, summary judgment is

appropriate where no other evidence of discrimination is present."  Id. (citation

omitted) (emphasis in original).  Hines-Smith attempts to prove she was

terminated because of her race in two ways.  First, she asserts that she did not

break the attendance rule.[25]  Second, she contends that the "racial animus of Chris

Byrley and the problems she had getting her sales installed" impacted her

termination and is evidence of a discriminatory motive.  (Pl. Opp. Br. at 12 n.3.)

Hines-Smith's self-serving assertion that she was not late does not alone

establish that she was terminated because of her race.  "A plaintiff must show not

merely that the defendant's employment decisions were mistaken but that they

were in fact motivated by [race]."  Lee, 226 F.3d at 1253.  The role of the court "is

to prevent unlawful hiring practices, not to act as a super personnel department

that second-guesses employers' business judgments."  Id. at 1254.  The court's

"sole concern is whether unlawful discriminatory animus motivates a challenged

employment decision."  Damon, 196 F.3d at 1361. Whether Hines-Smith was, in

---

[25] Involved in this argument is Hines-Smith's contention that there was not an attendance
policy.  The record, including the testimony of Hines-Smith, clearly confutes this assertion.  It is
undisputed that while Hines-Smith was working her light duty assignment she had to be at work
at certain hours, and that she was paid by the hour.  That there was no attendance policy for
resale representatives is irrelevant as Hines-Smith was not working in this position at the time of
her termination.

fact, late for work, has no bearing on the ultimate issue whether she was terminated because of her race.[26]

Hines-Smith also attempts to link her termination to the alleged racial bias of Chris Byrely and alleged cancellations of her installation.  These arguments do not amount to "evidence of discrimination" as required by the Eleventh Circuit. See Wilson, 376 F.3d at 1092; Holifield, 115 F.3d at 1562.  The record is devoid of any evidence linking the alleged racial animus of Bryley to Hines-Smith's termination.  There is no evidence when the "gorilla" statement was made by Bryley or that ADT knew about the alleged racial animus of Bryley until well after Hines-Smith was terminated.  (Hines-Smith Dep. at 175; Ex. A to Pl. Opp. Br.)  Additionally, Bryley was not Hines-Smith's supervisor, and there is no evidence that Bryley had any involvement in any of Hines-Smith's disciplines or termination.  Hines-Smith's attempt at a "cat's paw" argument simply fails.  See Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1331-32 (11th Cir. 1999).  Moreover, there is no evidence linking Bryley to any of the cancellations of her

---

[26] The court acknowledges that this argument is very relevant to whether or not the employer's legitimate, nondiscriminatory reason for her termination was false.  The Eleventh Circuit has explained that such a showing, when combined with a prima facie case, allows a reasonable juror to infer a discriminatory motive.  See Wilson, 376 F.3d at 1091.  It is not relevant in this context, however, because Hines-Smith failed to establish a prima facie case.  She, therefore, fails to raise any inference of discrimination that could be combined with her evidence that the employer's legitimate, nondiscriminatory reason for her termination was false, thus allowing a juror to infer a discriminatory motive.

contracts.  Hines-Smith's testimony regarding her theory is exactly as she described, "speculation."  (Hines-Smith Dep. at 36.)

In summary, Hines-Smith failed to establish a prima facie case of discrimination regarding her termination.  She failed to identify a similarly situated employee outside her classification who was treated more favorably by ADT.  In addition, she failed to present evidence from which a reasonable juror could conclude that any discrimination occurred in her termination.  As such, summary judgment is due to be granted on her termination claim.

## VI.  Conclusion

The court finds that no material issues of fact remain and that defendant ADT Security Services, Inc. is entitled to judgment as a matter of law as to all claims asserted by plaintiff.

A separate order will be entered.

**DONE** this the ___4th___ day of December, 2007.

_____
SENIOR UNITED STATES DISTRICT JUDGE